# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF FLORIDA
# GAINESVILLE DIVISION

**BRANDON R. SMITH,**

    **Plaintiff,**

**v.**                                          **CASE NO. 1:20-CV-168-AW-JRG**

**CAMPUS LODGE GAINESVILLE,**
**Et al.**

    **Defendants.**

_____/

## DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Now come Defendants, Coastal Ridge Management, LLC and Campus Lodge Gainesville, by and through undersigned counsel, and hereby respectfully move this Honorable Court for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. There are no genuine issues of material fact as to the merits of Plaintiff Brandon Smith's claims and Defendants therefore are entitled to judgment as a matter of law. The reasons for this Motion are more fully set forth in the accompanying Memorandum in Support, which is attached hereto and incorporated herein.

Respectfully submitted,

Cruikshank Ersin, LLC
/s/ Elizabeth Cruikshank
Elizabeth Cruikshank, Esq.
FBN 120345

1

beth@cruikshankersin.com
6065 Roswell Rd, Ste 680
Atlanta, GA 30328
770.884.8184
770.884.8113 (Facsimile)
Attorney for Defendants.

## MEMORANDUM IN SUPPORT

### I.      INTRODUCTION

Plaintiff Brandon Smith ("Plaintiff") alleges that Defendants – Coastal Ridge Management, LLC (hereinafter "Coastal Ridge") and Campus Lodge Gainesville (hereinafter "CL Gainesville") (Coastal Ridge and CL Gainesville are hereinafter collectively referred to as "Defendants"), discriminated against him by charging him higher rent than non-African American residents.  Doc. 16, *First Amended Complaint*, p. 10.  Plaintiff also alleges that Coastal Ridge employees retaliated against him for filing this lawsuit and a fair housing claim with the Department of Housing and Urban Development ("HUD") and the Florida Commission on Human Relations (the "Commission"). *Id.* at p. 11.

Plaintiff's poorly pled claims are exceedingly frivolous and contrary to indisputable fact.  As an initial matter, Plaintiff's discrimination claim – premised (unbelievably) only on a few conversations with neighbors – fails to state a claim upon which relief may granted. Simply alleging that "Defendants charge me more rent because I am African American", without more, fails to invoke this Court's jurisdiction. But regardless, the irrefutable evidence disproves Plaintiff's claim.  Plaintiff was charged the same rent as other *similarly situated* CL Gainesville residents (which is why, in large part, the Commission, acting in proxy for the Department of Housing and Urban Development, issued a well-reasoned decision on this exact discrimination claim, finding there is no "reasonable cause to believe that a discriminatory housing practice occurred".  *See Affidavit of Ryan G. Dolan*, ¶ 6, attached hereto as Exhibit 1 and incorporated herein by this reference (hereinafter referred to as the "Dolan Affidavit")).

Plaintiff's poorly pled retaliation claim is also frivolous and exposes his utter lack of understanding of how student housing operates.  Plaintiff complains that Defendants "decreased

Plaintiffs [sic] services in retaliation, [sic] by locking the bedroom door to room 816-B and prevented entry from [sic] Plaintiff". Doc. 16, *Amended Complaint*, p. 11.   What Plaintiff conveniently fails to leave out is that Plaintiff did not, and still does not, have the right to access Bedroom 816-B. S*ee, generally, Affidavit of Joe McDiffitt,* attached hereto as Exhibit 2 and incorporated herein by this reference (hereinafter referred to as the "McDiffitt Affidavit").

Although Plaintiff signed a lease for Bedroom 816-B, Plaintiff never paid his first month's rent toward that lease (or any month thereafter). S*ee, generally, Affidavit of Ashley Rankin,* attached hereto as Exhibit 3 and incorporated herein by this reference (hereinafter referred to as the "Rankin Affidavit").   Plaintiff, therefore, did not have a legal right to store any of his belongings in bedroom 816-B; Plaintiff did not have a legal right to occupy bedroom 816-B; and Plaintiff did not have the right to bar CL Gainesville maintenance staff from entering the unit to perform necessary maintenance on Bedroom 816-B prior to the commencement of the lease term (or thereafter).   The Commission also found in Defendants' favor on Plaintiff's "harassment" claim, which is virtually identical to the retaliation claim before this Court. Dolan Affidavit, ¶ 4.

The evidence attached to this Motion unequivocally shows that Plaintiff's allegations are frivolous and have no merit.   Accordingly, Plaintiff's Complaint should be dismissed with prejudice and Defendants should be awarded attorneys fees and costs.

## II.      STATEMENT OF FACTS

### A.      Campus Lodge Gainesville and Coastal Ridge Real Estate

CL Gainesville is a student housing apartment complex located at located at 2800 SW Williston Road, Gainesville, Florida 32608. *See* McDiffit Affidavit, ¶ 2. CL Gainesville is owned and held by a special purpose entity called CL Gainesville Borrower, LLC, a Delaware limited

liability company.  CL Gainesville Borrower, LLC has no employees; its sole purpose is to own the CL Gainesville property.

Defendant Coastal Ridge Management, LLC, an Ohio limited liability company, was founded in 2013 as a full-service real estate management firm and is headquartered in Columbus, Ohio. With approximately 500 employees, Coastal Ridge manages 60 multifamily housing communities (conventional apartments and student housing apartments) in 16 different states, including 6 in Florida. *McDiffitt Affidavit, ¶ 3*.

Coastal Ridge is responsible for managing CL Gainesville.  Managing a student housing property like CL Gainesville includes responsibilities such as marketing the property and signing leases for new residents, preparing the apartment units for the residents and scheduling move-ins, addressing all resident concerns, and the proper maintenance of the facilities.  *See* Rankin Affidavit, ¶ 3.

Coastal Ridge does not discriminate against any applicant or resident on account of race, color, religion, sex, handicap, familial status or national origin.  Coastal Ridge is committed to compliance with all Federal Fair Housing laws.  *See* McDiffitt Affidavit, ¶ 4; *See also*, Affidavit of Kelvin Hendrix, ¶5, attached hereto as Exhibit 4 and incorporated herein by this reference (hereinafter, "Hendrix Affidavit").  In its history, Coastal Ridge has never been found to have violated the fair housing laws.  Dolan Affidavit, ¶ 6.  The staff at CL Gainesville receive extensive training and education in all areas of Fair Housing law.  All staff are required to take yearly courses on Fair Housing and Discrimination, which includes the requirement of passing a Fair Housing quiz at 80%.  McDiffit Affidavit, ¶ 4.  Each of the employees that have interacted with Plaintiff, and all CL Gainesville staff, have taken and passed with a score of 80% or better the following training modules related to Fair Housing:

-Fair Housing Basics

-Fair Housing Disability

-Fair Housing Disparate Impact

-Fair Housing Familial Status

-Fair Housing for Service Animals

*See McDiffitt Affidavit,* ¶*4.* Each training module educates the staff on issues arising under the Federal Fair Housing Laws. Training topics include, but are not limited to: protected classes, reasonable accommodations, disparate impact, and prospect screening that does not have a discriminatory effect.  Coastal Ridge's goal is to ensure that everyone has the same access to housing, amenities, features, and services.  Coastal Ridge is committed to making sure each staff member knows that a violation of Federal Fair Housing Law is unacceptable, and how to conduct business so that no violations would ever occur.  *Id.*

**B.** **How Coastal Ridge Establishes Rental Rates**

Plaintiff's discrimination allegation reveals his ignorance on not only how student housing leasing operates, but also on the basic concept of *supply and demand*. Student housing lease agreements are 12-month agreements executed on a "per-bed" basis, meaning, an apartment unit with two bedrooms will be leased to two different residents under two different lease agreements and the two residents share the common areas (e.g., kitchen, living room).  *McDiffitt Affidavit,* ¶ *6.*  Coastal Ridge's Director of Property Management, with assistance from others, meet once per year to establish initial rental rates for a prelease cycle.  *Id.*  A "prelease cycle" refers to that period of time during which a student housing property such as CL Gainesville is preparing to market and sell leases to prospective residents for the following school year.  After initial rates are set for a property's different floorplans, these rates are evaluated on a weekly basis by the Director of

Property Management, the Property Manager, the Regional Manager and the Director of Asset Management, amongst others.  *Id.*

Coastal Ridge utilizes a tiered rate system to establish rental rates, meaning that different floor plans are priced according to their tier and that the lowest rates are available on the first leases signed.  From there, rental rates for a particular floorplan are increased, or possibly decreased, based on the number of leases that have been signed for that floorplan. *Id* at ¶ 7.  Lease rates are not assigned on an individual unit basis; rather, rental rates are established for a tier based purely on the number of leases signed at a particular price point for a particular "floorplan". All student housing communities managed by Coastal Ridge, including CL Gainesville, have units that are different – different "floorplans"; i.e., some units have 2 bedrooms, some 4 bedrooms, etc.  Some units may be more desirable based on that unit's particular floorplan design.  *Id.*

From time to time, throughout the preleasing cycle, a change may be made to the initially approved tiered rental rate plan.  *Id.* At ¶ 8.  This is done by adjusting the tiers or assigning a new rate or rent concession for all leases of a given floorplan.  Property level employees do not adjust rental rates; rather, that directive will come from the Director of Property Management or other corporate staff.  In other words, it is not possible – because of Coastal Ridge's tiered rate approach to pricing directed by the corporate office – for property level staff to increase rental rates for one individual for any reason.  *Id.*

There are several factors that are evaluated when making a change to a floorplan pricing tier, such as:

> • Year-over-year preleasing percentage, meaning, if a specific floorplan is leasing better or worse when compared to the previous year's preleasing period, then this could lead to price reduction or increase.  Basic supply

and demand.  This does not necessarily follow the property's overall preleasing

success; rather, it is evaluated on the property's success with a particular floorplan

at the property.

> •  Market conditions and competitor performance.  On a weekly basis,
> Coastal Ridge completes market surveys to understand how our competitors in that
> market are performing (i.e., the pricing of their units and occupancy rates).

*Id.*

### C.  The Student Housing "Turnover" Process

All student housing apartment complexes go through the "turnover" process each summer.

CL Gainesville is no exception.  During the hectic "turn" season (as it is affectionately known in

the industry), property level staff are responsible for moving out all outgoing residents, performing

required maintenance (such as painting, cleaning and minor repairs) for hundreds of vacated units

and vacated bedrooms, and then moving in all new residents for the upcoming school year.

McDiffitt Affidavit, ¶ 9.

While conventional apartments have the luxury of spacing out unit turnovers throughout

the year, student housing unit turnovers occur during a short time span of approximately two weeks

every summer.  Because conventional apartments do not have the same volume of units turning

over at the same time, the turns can typically be accomplished by in-house maintenance staff,

whereas student housing providers need to hire outside vendors to get all the work done.  *Id* at ¶

10.

When Plaintiff's roommate who was initially residing in Bedroom 816-B moved out, CL

Gainesville maintenance staff, and vendors hired by CL Gainesville, needed access to Bedroom

816-B to "turn" it.  The bedroom needed to be inspected for damage, cleaned, painted, etc., to

prepare it for its next resident.  Failure to "turn" a unit can result in resident dissatisfaction and the deterioration of the conditions of the unit or a bedroom therein.  *See* Affidavit of Johnathan Spence, ¶ 6, attached hereto as <u>Exhibit 5</u> and incorporated herein by this reference (hereinafter, "Spence Affidavit").

Plaintiff alleges that Defendants retaliated against him by "entering his apartment unit without his knowledge".  Doc. 16, *Amended Complaint*, p. 11.  The reality is that Coastal Ridge maintenance staff and "turn" vendors were simply *trying* to do what they were doing for all of the CL Gainesville units – "turning" them in preparation for the upcoming school year.  Spence Affidavit, ¶ 6.  Plaintiff continually obstructed Defendants' efforts to turn Bedroom 816-B by refusing access on multiple occasions and not cooperating when trying to schedule an accommodating time with Plaintiff.  *Id* at ¶¶ 7,8.  Plaintiff was provided advance notice each time Defendants or vendors needed to enter the unit to perform maintenance.  *Id.*  Plaintiff refused to cooperate despite the advance notice given and despite the lease agreement's provision that allows Coastal Ridge staff to enter the unit to perform maintenance.  *Id*.

### D.    Plaintiff's Lease Agreements

Plaintiff executed his first lease agreement with CL Gainesville on July 16, 2019 for Bedroom 816-A (the "2019 Lease Agreement").  McDiffitt Affidavit, ¶ 11.  The 2019 Lease Agreement only indicates the floorplan (2x2, meaning two bedrooms under separate lease agreements) and does not indicate the exact unit number or which room in the 2x2 unit Plaintiff is assigned to.  *Id.*  This is standard in student housing leasing – the lease agreement will indicate the floorplan chosen and then the resident will be assigned a roommate and room number prior to commencement of the lease term.  Plaintiff was provided written notice of which unit he was assigned to and who his roommate would be prior to commencement of the 2019 lease term.  *Id.*

Prior to the expiration of the 2019 Lease Agreement, Plaintiff renewed his lease agreement for bedroom A in unit #816 for a term commencing August 1, 2020 and ending July 31, 2021 (the "2020 BR A Lease Agreement").  *See* Id. at ¶ 12.  Because the 2020 BR A Lease Agreement was a renewal lease agreement, the lease agreement *does* indicate Plaintiff's exact unit number and bedroom.  *Id.*  As opposed to new leases, renewal lease agreements do contain this information.  This is standard for student housing properties.  Id.[1]

Plaintiff did not want CL Gainesville to assign him a roommate during the renewal term, so he decided to execute a second lease agreement for Bedroom B in unit #816 for a term commencing August 17, 2020 and ending July 31, 2021 (the "2020 BR B Lease Agreement").  The 2020 BR B Lease does not commence until 17 days after expiration of his 2019 Lease.  This 17-day delay in the commencement of the 2020 BR B Lease Agreement is the time CL Gainesville needs to "turn" then unit and bedroom for the new resident that just signed the lease for bedroom B.  This is called "turning" a unit/bedroom, as described above, and generally involves cleaning, painting and minor repairs to the unit/bedroom.  Consistent with the standard procedure described above, CL Gainesville sent Plaintiff a Room Assignment notification for bedroom B.  *See Id. at ¶11.*

After Plaintiff's former roommate moved out, but prior to commencement of the 2020 BR B Lease Agreement, Plaintiff began storing some of his personal items in Bedroom 816-B.  Spence Affidavit, ¶ 5.  Because Plaintiff refused to pay his first months' rent on the 2020 BR B Lease Agreement, Defendants were forced to prohibit Plaintiff from accessing that Bedroom 816-B.  But because Plaintiff had been storing his possessions in there (despite not having the legal right to do

---

[1] Although not relevant to this case (but relevant to showing how irrational Plaintiff has been throughout this saga), the room number designations on the renewal lease vs. the new lease is spelled out because Mr. Smith, unbelievably, does not believe he should be held liable on the 2020 Bedroom B Lease Agreement (if Defendants were to pursue a breach of contract action against him) because his new lease did not indicate his unit and bedroom number.

so), those possessions were locked inside, but only after Defendants clearly communicated to Plaintiff what they were doing in order to give him the opportunity to remove his belongings from the second bedroom.  Defendants contacted Plaintiff on multiple occasions to coordinate a time to unlock the bedroom so that Plaintiff could retrieve his items, but predictably, Plaintiff was not cooperative.  *Id.* ¶ 9.

Plaintiff was essentially holding Bedroom 816-B hostage.  He signed a lease agreement with no intention of paying rent.  When this happens in student housing, the economic damage done by such an act is hard to recover from because students have, by that time, already found a place to live.  Students do not typically move in after the school year begins.  This makes mitigating damages for lost rent difficult.  For this reason, when a resident fails to show up or collect keys after signing a student lease agreement, the breach of contract makes the total amount of rent immediately due and payable, which will be sent to an attorney to get a judgment on a breach of contract action, or, more typically, sent to a collections agency to handle.  Rankin Affidavit, ¶ 5. When Plaintiff did this to CL Gainesville, CL Gainesville sent the contract to collections, which is consistent with standard operating procedure and Plaintiff's lease agreement.  *Id.* at ¶¶ 5, 6.

## III.    LAW AND ARGUMENT

### A.    Standard for Summary Judgment

Defendants must demonstrate "there is no genuine issue as to any material fact" and they are "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary Judgment is appropriate where the record reflects there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). A fact is "material" if, under the applicable substantive law, it might affect the outcome of the case. *Hickson Corp. v. N.*

11

*Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)**.**

In order to survive a Motion for Summary Judgment, the Plaintiff must show a prima facie case of racial discrimination. In order to show a prima facia case, the Plaintiff must show that the housing practice was motivated by a racially discriminatory purpose or must show it has a disproportionate adverse impact on minorities. *Smith v Town of Clarkton,* 682 F.2d 1044, 1065, (4 Cir 1972), *Betsey v Turtle Creek Associates*, 736 F.2d 983 (4th Cir. 1984).

**B.     The Commission Found in Defendants' Favor on Nearly Identical Claims to the Claims Asserted in this Action.**

As stated above, Mr. Smith filed a fair housing claim with HUD nearly simultaneously with filing this lawsuit.   Dolan Affidavit, ¶ 6.   As in this action, Plaintiff alleged racial discrimination with respect to how much rent he was being charged.  After its investigation, which included interviews of CL Gainesville staff, the Commission found in Defendants' favor.  *See* Dolan Affidavit, ¶ 6.

Although Plaintiff labeled it "harassment" in the fair housing claim, and not "retaliation" as he alleges in this action, the fair housing "harassment" claim is nearly identical to the retaliation claim alleged herein (with the exception of the claim's nexus to the 3 Day Notice to Vacate and Plaintiff's account being sent to collections").  He complains of unauthorized entry to his unit; and he complains about CL Gainesville cutting off his access to Bedroom 816-B (despite the fact that he did not have a lease agreement in place for that bedroom).  Once again, the Commission found in Defendants' favor.  *Id.*  It appears that Mr. Smith's "harassment" claim, asserted prior to his account being sent to collections for failure to pay first month's rent, somehow evolved into a

retaliation claim, even though his account had yet to be sent to collections when CL Gainesville was trying to "turn" his unit.  Accordingly, the only logical facts relevant to Plaintiff's retaliation claim is the fact the Defendants posted a 3-Day notice to vacate Bedroom 816-B and sent his account to collections.  But as demonstrated herein, the 3-Day notice to vacate and sending his account to collections was done in strict compliance with company policy, not in retaliation for trying to exercise his civil rights.

The Commission's informed judgment in the Plaintiff's fair housing case is entitled to respect and a certain amount of deference.  *Skidmore v. Swift & Co., 323 U.S. 134, 65 S. Ct. 161 (1944).*  The Commission thoroughly investigated the matter and based its judgment on valid reasoning (based on the clear evidence provided to the Commission).  Accordingly, Defendants' respectfully request that this Honorable Court not upturn the Commission's well-reasoned judgment.

**C.     There is No Genuine Issue of Fact Regarding Whether Defendants Discriminated Against Plaintiff on Account of his Race.**

Plaintiff's discrimination claim is informed by, and premised upon, conversations "with a few other tenants of different races".  Doc 16, Amended Complaint, p. 10.  These few other residents apparently told him that they are paying $30-$40 less than him in monthly rent.  *Id.*  This is the full extent of Plaintiff's allegation.  He does not allege he is similarly situated to the other residents; nor does he allege that he leased the same unit type and signed his lease around the same period of time as these other tenants.  A discrimination claim devoid of the most basic of factual development and based on such a flawed foundation should be dismissed as a matter of law.

In any event, Defendants did not discriminate against Plaintiff; nor was it possible for Defendants to discriminate against Plaintiff in the manner he has alleged.

In *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S. Ct. 1817, the U.S. Supreme Court established that the legal framework for discrimination cases brought under the Fair housing Act of 1968 is a three-part burden of proof test.  Plaintiff must prove that: (1) he is a member of a protected class; (2) that he applied for and was qualified to rent the property; (3) he was rejected and/or disparately treated; and (4) the rental property remained available thereafter and/or others similarly situated received more favorable treatment.  See, also, *Selden Apartments v. U.S. Dept. of Housing and Urban Development* (1986), 785 F. 2d 152, 159.

Once a *prima facie* case is established, the burden shifts to the Defendants to articulate some legitimate, nondiscriminatory reason for the alleged discriminatory behavior.  *McDonald Douglas*, at 802.  Defendants' burden at that point consists of producing evidence which would allow the fact finder to rationally conclude that the alleged discriminatory act had not been motivated by discrimination.  *Texas Dept. of Community Affairs v. Burdine* (1981), 450 U.S. 248, 254-257, 101 S. Ct. 1089.  However, the ultimate burden of persuading the fact finder that Defendant intentionally discriminated against Plaintiff remains, at all times, with Plaintiff.  *St. Mary's Honor Center v. Hicks* (1993), 509 U.S. 502, 507, 113 S. Ct. 2742.

Plaintiff cannot establish that those similarly situated to him received more favorable treatment.  Review of CL Gainesville's leasing records shows that Plaintiff received the same deal on his 2020 BR A Lease Agreement and his 2020 BR B Lease Agreement as other "similarly situated residents" (i.e., residents who signed their 2020-2021 lease agreement for the same floorplan as Plaintiff around the same period of time).  *Id*. at ¶ 13.  For example:

> • Audun Cowart, a Caucasian resident, signed a lease agreement on February 6, 2020 for bedroom B in unit #518, which is the same 2x2 floorplan as Plaintiff's, for $615.00/month.  *See Id. at ¶13.*  Also note that because this was Mr.

Cowart's first lease agreement, and not a renewal lease, the agreement does not indicate the exact unit number and bedroom assignment, which is consistent with Plaintiff's lease, standard operating procedure, and all the leases described below. *Id*.

- Haily Woodbury - a Caucasian resident, signed a lease agreement on April 27, 2020 for bedroom A in unit #916, which is the same 2x2 floorplan, for $615.00/month.  *Id*.

- Juny Wang – an Asian resident, signed a lease agreement on March 25, 2020 for bedroom A in unit #528, which is the same 2x2 floorplan, for $615.00/month.  *Id*.

- Spencer Durbin - a Caucasian resident, signed a lease agreement on April 27, 2020 for bedroom B in unit #916, which is the same 2x2 floorplan, for $615.00/month.  *Id*.

It may be true that the other residents Plaintiff spoke to *may* have a different rental rate than what was provided to him.  But those other residents likely signed their lease agreements at a different time and/or for a different floorplan, making them not "similarly situated".  In any event, the facts demonstrate that Plaintiff was not discriminated against on account of his race as he received the same rental rate as other residents that we know to be "similarly situated", regardless of race.

Plaintiff has not alleged any facts other than a blanket statement that a few other tenants are paying "$30-$40 less" than Defendant.  Plaintiff has not, and cannot, cite any facts, allege any practices, or list anything that would lead one to conclude that his rental rate was somehow influenced by his race. And, in fact, it would be impossible for CL Gainesville to discriminate on

the basis of race because those individuals that are setting the rates do not know the races of the individuals that will eventually lease a unit of a particular tier or floor plan.  Accordingly, as there are no issues of material fact pertaining to Plaintiff's discrimination claim, Defendants respectfully request that this Court issue judgment in their favor on Plaintiff's frivolous claim of discrimination.

### D. There is No Genuine Issue of Fact Regarding Whether Defendants Retaliated Against Plaintiff on Account of his Protected Conduct.

Plaintiff first alleges that Defendants retaliated against him by entering his apartment illegally and locking bedroom B's door. However, Defendants were justified in their actions for multiples reasons: (i) Defendants have a right to enter Plaintiff's apartment for required maintenance per the terms of the lease agreement; (ii) Defendants always provided notice of when then they needed to enter Plaintiff's unit to perform maintenance; (iii) Plaintiff did not have a lawful possessory interest to the bedroom he complains he was locked out of against his wishes; (iv) regardless of whether Plaintiff filed his fair housing claim or this lawsuit, Defendants were simply following their student turn policy.

Before Plaintiff could proceed with taking possession of bedroom B, CL Gainesville staff had to conduct the "turning" process.  As explained above, the turning process is a standard procedure for student housing providers preparing for the new school year. On July 8, 2020, Plaintiff emailed CL Gainesville staff claiming that someone unlawfully entered his unit, but Mr. Morales had entered the unit to conduct his portion of the turning process, which is allowed by language in the lease agreement. *Id.* at ¶7. Mr. Morales was checking to see if Plaintiff's roommate was still present in the unit or if he left keys or belongings. Mr. Morales appropriately knocked on the door, waited, and opened the door, where he was met by Plaintiff, who prevented his entry. *Id.* Mr. Morales politely agreed to come back the next day. *Id.* Mr. Morales attempting to enter the

unit was entirely justified and necessary to execute the turning process. *Id*. It is of the utmost importance to CL Gainesville that tenants feel that they respect their privacy, and tenants know that staff members would not enter their units unless it is for a legitimate, lawful purpose. *Id*. Furthermore, on August 3, 2020, Plaintiff emailed CL Gainesville staff members to inform them that he did not want any vendors entering his unit during "turn." *Id*. at ¶8. Plaintiff had rejected the painters who were present to conduct their portion of the turning process. *Id*. Plaintiff's interference with CL Gainesville's attempts to prepare Bedroom 816-B for its next occupant was inappropriate and irrational at best, and a violation of the terms and conditions of his lease agreement at worst.

The turning process is necessary to ensure that all units meet the standards set by Coastal Ridge Management; not to mention that Coastal Ridge has a legal duty to ensure that its apartments and bedrooms are safe to live in. *Id*. All units undergo the same turning process when residents move out and Bedroom B of Plaintiff's unit was no exception. *Id*. Plaintiff turning away vendors creates unnecessary inconveniences and expenses for the property because the vendors will have to come back to the property on a different day.

On August 4, 2020, Plaintiff emailed again stating that someone had once again illegally entered his apartment. However, Plaintiff was notified on July 30 and August 3 by Mr. Hendrix via email that vendors would be entering the unit, which Plaintiff admits he received and ignored. Hendrix Affidavit, ¶11.

Plaintiff falsely believes that staff members and vendors entering his apartment during this time was unlawful and retaliatory. However, under his signed lease agreements, CL Gainesville was legally allowed to enter the unit to conduct the turning process.

After Plaintiff's roommate moved out and prior to the commencement of the lease for bedroom B, Plaintiff, on his own volition, moved his belongings into the bedroom without consent or legal authorization. CL Gainesville had every right to lock the door to prevent Plaintiff from utilizing bedroom B until the commencement of his lease because he was not paying rent for the space until August 17, 2020.

Despite requesting that he be able to occupy the entire unit alone and executing the 2020 BR B Lease Agreement, Plaintiff inexplicably chose to not pick up the keys to the bedroom or submit any payment of rent. Plaintiff's actions, or lack thereof, rendered him a "no show" for bedroom B, meaning that Plaintiff skipped out on his contractual obligation to pay rent. Rankin Affidavit, ¶ 5. When an individual such as Plaintiff is considered a "no show," the amount due under the contract is accelerated and usually sent to collections or an attorney to get a judgement for damages. After Plaintiff no showed for bedroom B, Mr. Spence reached out to Plaintiff about retrieving his belongings from bedroom B on October 6, 2020. *Id*. Plaintiff responded that he would let Mr. Spence know when he was available, but Plaintiff demanded no further contact with Mr. Spence because he was named in the frivolous fair housing complaint and the present lawsuit. *Id*.

Plaintiff also alleges that Coastal Ridge's General Counsel, Ryan G. Dolan, retaliated against him by using intimidation tactics. This was not retaliation. Mr. Dolan was simply trying to do his job. Mr. Dolan tried many times to contact Plaintiff to discuss the fair housing case and this litigation, with the hope of an amicable resolution. However, Plaintiff was predictably obstinate and irrational. Dolan Affidavit, ¶ 8. Over the course of Plaintiff's tenancy at CL Gainesville, he has demonstrated a pattern of conduct that is irrational and interferes with Defendants good faith efforts to provide a clean, safe and healthy living environment for all of CL Gainesville's residents.

18

*See, e.g.,* Rankin Affidavit at Exhibit A (emails regarding Plaintiff's refusal to abide by Fire Marshall Order).  More disturbingly, Plaintiff has demonstrated that he has no qualms with being dishonest in an apparent effort to perpetuate a fraud upon Defendants and this Honorable Court. Id. at ¶ 13; *see also,* Affidavit of Kevin Schmehl attached hereto and incorporated herein as <u>Exhibit 6</u>.

Plaintiff also alleges that CL Gainesville's property manager, Ashley Rankin, filed "false documentation".  Doc 16, Amended Complaint, p. 10. The documentation Plaintiff is referring to is a three-day Notice to Vacate. Rankin Affidavit, ¶ 5. Plaintiff falsely believes that a CDC Declaration prevented him from being evicted from bedroom B. *Id*. Mr. Dolan explained to Plaintiff that the CDC Declaration was irrelevant to bedroom B because Plaintiff had never formally taken possession of Bedroom B nor was he living in Bedroom B. *Id*. Ms. Rankin's acts were completely justified given that Plaintiff had failed to legally take possession and pay rent for bedroom B. *Id*. Ms. Rankin sending the Notice to Vacate was standard procedure for CL Gainesville. *Id*.  "Failure to pay rent provides [Defendants] with a legitimate, no-discriminatory reason for . . . any allegedly retaliatory conduct."  *Ward v. Dickens,* 2012 WL 1038184, 3 (W.D. Ky. 2012).

Plaintiff alleges that roaming property manager, Kelvin Hendrix, retaliated against him by claiming nonpayment of rent. Mr. Hendrix was correct in asserting that Plaintiff had not paid his full rent because there was an outstanding balance on his account. Plaintiff had signed two lease agreements, and by signing these binding agreements, he agreed to pay $1,230 for the entire unit, which he failed to do.  Again, Defendants' actions were taken in accordance with Coastal Ridge policy, not in retaliation for filing this suit or the Fair Housing Case.

The mere fact that Plaintiff filed a fair housing claim with HUD and a complaint with this Honorable Court does not allow him to disregard his contractual duty to pay rent.  Nor does it somehow provide Plaintiff with access to and legal possession of a bedroom he has yet to pay for.  Nor does it empower Plaintiff to bar CL Gainesville staff from entering the unit to carry out required yearly maintenance.

## IV.    CONCLUSION

Plaintiff has failed to provide, nor could he provide, any facts which would show that Defendants treated Plaintiff differently or that Defendants have any practice which is racially motivated or would have a disproportionate impact on Plaintiff or any minority.  Conversely, Defendants have provided ample evidence showing: (1) Plaintiff was treated the same as similarly situated residents; and because of Coastal Ridge's tiered rate approach to leasing, and because of who is responsible for setting lease rates (i.e., corporate staff who never meet or would never know the race of an applicant or resident, and certainly do not know Plaintiff), it is not possible for Coastal Ridge or CL Gainesville to discriminate against a resident in the manner alleged by Plaintiff; and (3) all alleged retaliatory actions by Defendants were in fact done pursuant to Coastal Ridge policy and authorized by Plaintiff's lease agreements.  Plaintiff's race was irrelevant to his failure to pay rent and Defendants' need to access the unit to perform maintenance.

Based on the foregoing, Defendants, Campus Lodge Gainesville and Coastal Ridge Real estate, by and through counsel respectfully, requests that the Court enter an Order granting their Motion for Summary Judgment, dismissing Plaintiff's Complaint with prejudice; awarding Defendants the costs incurred in this action, including reasonable attorneys' fees and granting such further relief as the Court deems just and proper.

This 5th day of April, 2021

Respectfully submitted,
Cruikshank Ersin, LLC
 /s/ Elizabeth Cruikshank
Elizabeth Cruikshank, Esq.
FBN 120345
beth@cruikshankersin.com
6065 Roswell Rd, Ste 680
Atlanta, GA 30328
770.884.8184
770.884.8113 (Facsimile)
Attorney for Defendants.